IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| TANGARRA HOLDING PTY LTD. | |
| *Plaintiff* | |
| v. | Civil Action No. 3:19-cv-00533 |
| DAVID STONE | |
| *Defendant* | |

## VERIFIED COMPLAINT SEEKING INJUNCTIVE RELIEF AND MONEY DAMAGES

### THE PARTIES

1. Tangarra Holding Pty Ltd. ("Tangarra") is an Australian limited proprietary company with substantial investment interest in various companies operating in Kentucky, Delaware, West Virginia, and Colorado.

2. David Stone ("Stone") is an Australian citizen living and working in the United States.

3. Stone regularly works and transacts business in West Virginia and Kentucky, though Stone has his principal residence in Colorado.

### JURISDICTION AND VENUE

4. Indeed, Stone is the managing member of various limited liability companies that, *inter alia*, buy and sell coal and coal products, as set forth more particularly below.

5. Stone is also the Chief Executive Office of at least one corporation (as set forth in more detail below) that is authorized to transact business in the State of West Virginia.

6. Each of these limited liability companies is (1) organized under the laws of the State of West Virginia; (2) operate regularly in West Virginia; or (3) both.

7. In the conduct of such business, Stone has, upon information and belief, taken the following actions, among other things, relative to the State of West Virginia:

   a. Stone has directed one or more of the entities to advertise in the State of West Virginia;

   b. Stone has personally attended numerous business meetings in the State of West Virginia;

   c. Stone has personally placed phone calls and sent various correspondence to counter-parties in the State of West Virginia;

   d. Stone has hired numerous employees from the State of West Virginia;

   e. Stone has purchased and sold personal property in the State of West Virginia;

   f. Stone has contracted with parties in the State of West Virginia;

   g. Stone has opened bank accounts in the State of West Virginia; and

   h. Stone has had business meetings specific to the transactions set forth herein in the State of West Virginia.

8. As a result of the foregoing (as set forth in more detail below), this Court has personal jurisdiction over Stone, and venue is appropriate in this Court.

**FACTUAL BACKGROUND**

9. In 2017, Tangarra was presented with an opportunity to purchase a group of assets in Central Appalachia, specifically located in both Kentucky and West Virginia, concerning the purchase and sale of coal.

10. Tangarra, through its authorized representative, Ray Younan, determined to purchase the assets.

11. To facilitate said purchase, Tangarra, with the help of its broker, Shane Philip, decided upon a corporate structure as follows: authorized representatives would form a British Columbian

holding company named Stella Natural Resources, Inc. ("Stella BC"), in which Tangarra would be the 100% owner; authorized representatives would form a Delaware corporation named Stella Natural Resources, Inc. ("Stella DE"), with a principal place of business in Huntington, West Virginia, in which Stella BC would be the 100% owner; and authorized representatives would then form various member-managed limited liability companies in which the sole member would be Stella DE.

12. In this manner, Tangarra sought to retain control over the leadership structure of the entire enterprise through its appointed delegates.

13. Tangarra sought and located a qualified representative to whom leadership responsibilities would be delegated: Stone.

14. After discussion with Stone, Tangarra agreed to hire Stone, along with two other individuals, Karl Arnold ("Arnold") and Rachel Walsh ("Walsh"), to oversee the day-to-day operations of the enterprise of companies that were to be formed.

15. Stone, Arnold, and Walsh (collectively, the "Management Team") were then employed by Stella DE pursuant to employment contracts dated March 1, 2017, which were signed by Ray Younan and each of member of the Management Team (the "Agreements").

16. Fully executed copies of the Agreements were to be retained in the business records of Stella DE.

17. The Management Team has not provided Tangarra access to the company records, including the Agreements, despite reasonable request and has even manipulated documents in the company "DropBox" accounts over the past several months.

18. True and accurate copies of the Agreements, *sans* signatures, which are being kept by Stella DE and withheld from Tangarra, are attached as **Exhibit A** (for Stone), **Exhibit B** (for Arnold), and **Exhibit C** (for Walsh).

19. Each of the Agreements defined the employer as "Stella Natural Resources" but also specifically provided that "this employment contract is underwritten and wholly enforceable to Tangarra," which is acknowledged to be "the principle investor engaging the team to implement the SNR strategy."

20. Each of the Agreements required, *inter alia*, the following from each member of the Management Team:

  a. to work "in the best interests of the Company at all times";

  b. to "[c]arry out and comply with all lawful and reasonable orders and instructions . . . provided to the Employee by the Company or by its . . . authorized officers"; and

  c. to "[r]efrain from acting or giving the appearance of acting contrary to the interests of the Company."

21. Once the Agreements were delivered and the Management Team began fulfilling their initial duties consistent with the Agreements, Tangarra began providing instructions to the Management Team, including funding capital needs of SNR DE and its subsidiary LLCs.

22. Additionally, the Management Team, consistent with Tangarra's instruction, formed the following limited liability companies, each with a specifically delineated function: SNR River Ops, LLC ("SNR River"); SNR Rail Ops, LLC ("SNR Rail"); SNR Logan, LLC ("SNR Logan"); SNR Stonecoal, LLC ("SNR Stonecoal"); and SNR Cheyenne, LLC ("SNR Cheyenne") (the "Central App LLCs").

23. Each of the Central App LLCs indicated to Tangarra that it was initially domiciled in Huntington, WV.

24. The Central App LLCs were formed to do the following:

   a. to mine coal from underground facilities in Logan County, West Virginia, Wayne County, West Virginia, and in Pike and Floyd Counties, Kentucky;

   b. to purchase coal from various coal suppliers in Kentucky and West Virginia;

   c. to process raw coal from both their own mines and the coal purchased from suppliers in Kentucky and West Virginia;

   d. to load coal onto barges on the Big Sandy River;

   e. to load coal into rail cars in Ivel, Kentucky; and

   f. to sell coal to end users all across the world.

25. SNR Logan and SNR Stonecoal were formed to operate surface mining operations at the Logan and Stonecoal mines.

26. During the course of their employment, each member of the Management Team accepted salaries and benefits that were funded through either (a) the capital investments from Tangarra; or (b) the revolving line of credit with GemCap Lending that was only provided upon the personal guaranty of Ray Younan.

27. Upon the formation of SNR BC, SNR DE, and the Central App LLCs, Ray Younan, on behalf of Tangarra, provided specific instructions to Stone to issue 1 share in SNR BC in the name of Tangarra.

28. Those instructions were provided to Stone via e-mail dated January 23, 2017 by Shane Philip, an authorized officer working on behalf of Tangarra.

29. A true and accurate copy of this e-mail is attached as **Exhibit D**.

30. Consistent with these instructions, Stone provided to Shane Philip and Ray Younan a purported Directors' Resolution dated February 21, 2017, of SNR BC, by which 1 common share of SNR BC was purportedly created and issued to Tangarra.

31. A true and accurate copy of this resolution is attached as **Exhibit E**.

32. Tangarra later learned, however, that this resolution was never entered into the company records and that Stone actually issued 1 share of SNR BC on February 21, 2017, but such share was issued to Stone himself.

33. A true and accurate copy of the share certificate is attached as **Exhibit F**

34. Stone had no authority to do so.

35. Indeed, said issuance was made not only in direct contravention of the reasonable instruction of Tangarra to Stone but it was also made in direct contradiction of Stone's own representations to Tangarra, both at the time of issuance and for nearly twenty (20) months thereafter.

36. Tangarra, in fact, did not discover that the share was not issued in its name until November 2018.

37. Tangarra came to learn of this deception after Ray Younan made a trip to the United States on Tangarra's behalf that month.

38. The trip by Ray Younan was precipitated by increasingly frequent capital investment requests from the Management Team at a time when the Central App LLCs should have been expected to have been self-sustaining through coal purchase, production, processing, and sales.

39. Indeed, the final act that precipitated the trip was an "urgent" request for capital investment following immediately upon the heels of a request by Stone for a first "urgent" capital investment of over $1,000,000.00 for the specific purpose of repairing a downed beltline necessary to efficient operations of SNR Rail Ops, specifically the Ivel processing plant that it owns.

40. Despite the fact that over a month had passed between Tangarra's funding of the first "urgent" capital request and the trip to the United States by Ray Younan, Younan personally witnessed that absolutely no repairs to the beltline had been made.

41. Stone then and has subsequently admitted that the funds were used for "other purposes," though those purposes are still unclear.

42. Over the following eight (8) months, Tangarra continued to fund investment requests from the Management Team after receiving numerous explanations and promises that the Central Appalachian operations would turn a corner.

43. Unfortunately, those operations never rebounded, and the Central App LLCs continue to woefully underperform projections and even modest expectations.

44. Indeed, based on the minimal records that Tangarra has received, it appears that the Central App LLCs diverted no less than $900,000.00 over the course of two years to the personal accounts of Stone.

45. Additionally, without the consent of Tangarra, the Management Team formed multiple other LLCs, all owned by SNR DE, each the beneficiary of intra-company transfers originating from capital investments provided by Tangarra specifically for the operations of the Central App LLCs.

46. The other entities were created as follows: SNR Marketing, LLC ("SNR Marketing"); Stella Natural Resources, LLC ("SNR LLC"); SRN Raton Ops ("SNR Raton"); SNR Appalachian Trading, LLC ("SNR Trading"); and SNR Industrial Properties, LLC ("SNR Industrial").

47. SNR Industrial and SNR Trading apparently were formed as part of efforts in the Central Appalachian operations, so those companies, together with the Central App LLCS, are referred to as the "Central App Enterprise."

48. SNR Marketing, SNR LLC, and SNR Raton apparently were formed to exercise rights purchased by Stone, using Tangarra investment capital, to purchase options in mineral assets in Colorado, so those companies are referred to collectively as the "Colorado Enterprise."

49. Over the last three months, Ray Younan has taken numerous actions on behalf of Tangarra to save relationships with multiple trade creditor, supplier, and purchasers, who were each being paid slowly (if at all) at the time.

50. Even with these actions, however, Stone has worked to further erode those relationships, and Stone has openly disparaged Younan and Tangarra while openly proclaiming that he (Stone) owned and controlled all of the Central App Enterprise.

51. As a result, and based on impending defaults to suppliers, trade creditors, and purchasers that will completely crater all current and future operations of the Central App Enterprise, Tangarra requested on multiple occasions that Stone execute documents necessary to transfer the share of SNR BC to Tangarra as initially directed (and represented) and to appoint qualified agents loyal to Tangarra's interest to the controlling positions of SNR DE and each of its subsidiary LLCs, including SNR Mineral Assets, LLC (which has not been previously mentioned, but was also formed by the Management Team, though at the request of Tangarra).

52. Stone refused to sign any such documents, despite the fact that he has admitted to his own fraud in writing, per the attached **Exhibit G**, in which Stone admits that (despite prior contrary instruction and his prior contrary representation to Tangarra) he issued the sole share of SNR BC, allegedly in trust, for the benefit of the investors of SNR BC, the sole investor of which is acknowledged in that same document to be Tangarra.

53. In the meantime, despite being instructed to freeze all hiring, Stone has hired several new members to fill in parts of the general operations and management teams, further inflating costs of operations without producing tangible results.

54. In one example, Stone hired an employee, paid her an excessive relocation fee to move her and her family from Australia, and she never performed any work for any of the various Stella entities.

55. The continued hiring shows blatant disloyalty to Tangarra and blatant disregard for the clear and unequivocal instructions of Tangarra.

56. Further, despite contrary instructions from Tangarra, Stone has also threatened on numerous occasions to file Chapter 11 bankruptcy petitions for some or all of the Stella entities, which would undoubtedly jeopardize Tangarra's substantial investment in the operations.

57. Without allowing Tangarra to obtain ownership of SNR BC and thus control over SNR DE and the subsidiary LLCs, Tangarra's investment, which now totals over $35 million, will be rendered nearly valueless.

## COUNT ONE:  DECLARATORY JUDGMENT

58. The allegations set forth in paragraphs 1 through 56 are incorporated by reference as if fully set forth herein.

59. Based on the dealings between the parties and the Employment Agreement between Stella DE and Stone, which is wholly enforceable by Tangarra, Tangarra is the actual owner of SNR BC.

60. Stone has absolutely no ownership interest in Stella BC.

61. Indeed, Stone admitted the same in his declaration attached as Exhibit G.

62. Stone, however, has continued to act as if Tangarra is not the owner of Stella BC and the subsidiary Stella entities.

63. In fact, Stone has represented widely (and falsely) that he is in full control and ownership of same.

WHEREFORE, Tangarra respectfully requests entry of judgment in its favor and against Stone declaring that Tangarra is the sole and rightful owner of Stella BC.

## COUNT TWO:  INJUNCTIVE RELIEF

64. The allegations set forth in Paragraphs 1 through 62 above are incorporated by reference as if fully set forth herein.

65. The actions of Stone in misusing funds invested by Tangarra for use in the legitimate business operations of the Central Appalachian entities harms not only Tangarra but also all of the many counterparties to contracts with the Central App Enterprise.

66. For example, without additional equity investments, which Tangarra is not willing to provide without having control of the assets and operations it owns, the Central App Enterprise entities will default on obligations to coal suppliers, to trade creditors, and to purchasers as follows:

  a. Fossil Coal stands to lose in excess of $1.5 million, which will cause a significant deficit in its own operational capabilities and could easily result in a loss of dozens of jobs;

  b. Industrial Supply stands to lose in excess of $400,000.00, which will also cause the same deficits and loss of jobs as above;

  c. Tahiti Trucking stands to lose in excess of $100,000.00, which will likely result in a closing of the business or the sale of significant company assets;

  d. Jody Puckett, whose company provides most of the labor force for SNR Rail, stands to lose in excess of $300,000.00, which will cause the loss of his company and the termination of approximately a dozen employees;

  e. Daniel Smith, whose company provides security services for SNR Logan and SNR Stonecoal, will no longer be able to employ a half-dozen security workers at the Logan County, West Virginia, and Wayne County, West Virginia mines;

  f. The Central App Enterprise may be unable to meet ongoing environmental obligations, which would cause immeasurable damage to the surrounding water table, animal habitats, drinking water, and landowners;

  g. Calvert City Metals, located in Calvert City, Kentucky, a primary purchaser of SNR coal products, would most likely have to idle operations within a period

of seven days potentially causing hundreds of layoffs and a protracted legal battle over the breach of contract damages; and

h.  Elkem Metal Canada, Inc.'s Chicoutimi plant would be forced to idle its plant for at least a month, again potentially causing hundreds of layoffs and another protracted legal battle over the breach of contract damages.

67.  As the people of both Kentucky and West Virginia know well, the coal industry as a whole has already suffered immensely, and the operations of the Central App Enterprise were designed to preserve and create jobs in a troubled industry.

68.  These actions would also cause the layoff or permanent termination of dozens of employees of the Central App Enterprise whose salaries range from $37,000.00 to $400,000.00.

69.  The ripple effect from these consequences would be even more dramatic.

70.  Moreover, the reputation of the Central App Enterprise and all those associated with it, including Tangarra, would suffer irreparable damage to their reputations, both financially and personally, including the near-complete loss of Tangarra's $35 million investment.

71.  The evidence is clear, as Stone has admitted as much, that Tangarra is the actual owner of SNR DE.

72.  However, Stone continues to unlawfully withhold the share evidencing Tangarra's ownership of SNR BC, which prevents Tangarra from exercising the control necessary to ensure the security and ongoing stability of the Central Appalachian operations.

73.  Moreover, Stone continues to unlawfully refuse to follow the instructions from Tangarra to replace Stone and his hand-selected management team with individuals loyal to Tangarra and knowledgeable in the coal industry.

74.  Finally, Stone has threatened, and will likely follow through on said threats without relief from this Court, to further hijack relationships between the Central App Enterprise and

GemCap, its revolving credit line financier, and between the Central App Enterprise and its contractual counterparties by, among other things, spreading false and misleading information about Tangarra and by continuing to manipulate, destroy, and conceal corporate records, bank account information, passwords, and the like.

75. If Stone is permitted to engage in such conduct, Tangarra will effectively be unable to transition in its new management team to save operations and prevent the damage set forth above.

WHEREFORE, Tangarra respectfully requests entry of judgment in its favor and against Stone as follows:

  a. Requiring Stone to immediately transfer his share of Stella BC to Tangarra;

  b. Enjoining Stone from interfering with Tangarra's exercise of control over Stella BC, Stella DE, or the subsidiary LLCs in management functions, the day-to-day operations, or in any other way;

  c. Requiring Stone to immediately provide all corporate documents, corporate computers, corporate bank accounts, and all other corporate account information, including log-in credentials and passwords, to Tangarra and its designated replacement management team;

  d. Requiring Stone to either directly or indirectly (through instruction to the appropriate member of his current management team) provide all support necessary for a smooth transition to a replacement management team without interruption of operations; and

  e. Enjoining Stone from either directly or indirectly interfering in any way with the ongoing operations of SNR BC, SNR DE, or the subsidiary LLCs through any means whatsoever, including, but not limited to, spreading rumors, contacting any financiers, lenders, contract counterparties, suppliers, employees, or any other party and discussing in any way the operations of these entities.

## COUNT THREE: FRAUD

76. The allegations set forth in Paragraphs 1 through 74 above are incorporated by reference as if fully set forth herein.

77. Stone has consistently misrepresented to Tangarra the status of ownership of SNR BC and thus the status of subsequent ownership of control of SNR BC, SNR DE, and the subsidiary LLCs.

78. Stone has consistently misrepresented to Tangarra the status of his loyalties to Tangarra.

79. Stone has consistently misrepresented to Tangarra the rationale behind additional investment requests from Tangarra.

80. Stone has also consistently misrepresented to Tangarra the actual use of investment funds provided by Tangarra.

81. Stone has made every such misrepresentation to Tangarra knowingly and consciously.

82. Tangarra had the absolute right, and, indeed, had every reason to rely upon the representations of Stone, who was, for all intents and purposes, its employee and agent.

83. As a result of those misrepresentations, at least $2,000,000.00, and possibly quite a bit more, of Tangarra's investment capital was misappropriated, quite likely to the personal accounts and use of Stone.

84. Tangarra has been damaged in at least this amount, if not to a larger degree when considering the negative impact on its ongoing and future business operations.

WHEREFORE, Tangarra respectfully requests entry of a money judgment in its favor and against Stone in an amount not less than $2,000,000.00.

## COUNT FOUR:  CONVERSION

85. The allegations set forth in Paragraphs 1 through 83 above are incorporated by reference as if fully set forth herein.

86. Tangarra authorized Stone and his hand-selected management team to create SNR BC, SNR DE, and some of the subsidiary LLCs.

87. Tangarra required Stone to issue a sole share of common stock in SNR BC to Tangarra to ensure that Tangarra would have security in its ownership of the enterprise and would have, at minimum, board-room level control over its assets.

88. Tangarra provided real property, personal property, and investment capital to Stone to use for the purpose of furthering the SNR enterprise.

89. Stone has wrongfully exercised dominion and control over all of the above to Tangarra's detriment.

90. Indeed, to this date, Stone has withheld or is withholding the sole share of SNR BC from its rightful owner, Tangarra, and Stone has withheld or is withholding control from Tangarra over the assets that it owns through the series of corporate entities forming the SNR enterprise.

91. Further, Stone has, to date, taken at least $2 million of investment capital earmarked specifically for the purpose of furthering the SNR enterprise and converted it to his own use.

92. All of the property specified above is or should be lawfully owned and controlled by Tangarra, and Tangarra would have access to the same but for the conversion of these assets by Stone.

WHEREFORE, Tangarra respectfully requests entry of a money judgment in its favor and against Stone in an amount not less than $2,000,000.00.

DATED:  July 21, 2019                                          TANGARRA HOLDING PTY LTD

By: /s/ Travis A. Knobbe
SPILMAN THOMAS & BATTLE, PLLC
Travis A. Knobbe, WV ID #13123

                One Oxford Centre, Suite 3440
                301 Grant Street
                Pittsburgh, PA 15219
                (T):  412.325.3311
                (F):  412.325.3324
                E-mail: tknobbe@spilmanlaw.com

## VERIFICATION

I, Ray Younan, declare as follows:

1. I am the authorized representative and authorized agent and a corporate officer of the Plaintiff in this case, Tangarra Holding Pty, Ltd., an Australian limited proprietary company.

2. I am a citizen of Sydney, Australia.

3. I have personal knowledge of the facts set forth in the Complaint above.

4. Consistent with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America, and under all similar and comparable laws of Australia, that the foregoing facts set forth in the Complaint are true and correct to the best of my knowledge, information, and belief.

Executed on 19/7, 2019.

Ray Younan